19071

SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Appellant, v. Gertrude B. WILSON, Anna Rebecca Drayton, Martha G. Alexander, Raymond Drayton and Aubrey W. Jones, Respondents, and Standard Oil Company and Shell Oil and Gas Company.

(175 S. E. (2d) 391)

*Messrs. Daniel R. McLeod, Attorney General,* and *C. Pinckney Roberts, Assistant Attorney General,* of Columbia,

and *Dan F. Laney*, of Bishopville, *for Appellant,*

*Messrs. Jennings & Jennings,* of Bishopville, *for Respondents,*

*Messrs. Daniel R. McLeod, Attorney General,* and *C. Pinckney Roberts, Assistant Attorney General,* of Columbia, and *Dan F. Laney,* of Bishopville, *for Appellant, in reply,*

June 26, 1970.

BUSSEY, Justice.

This is an appeal by the State Highway Department from a jury verdict in the amount if $30,200.00 in a highway condemnation case. The land involved belonged to the widow and children of one Aubrey Wilson. Raymond Drayton, a son-in-law of Wilson, is an interested party by virtue of having been a tenant of the property for many years and having constructed thereon a number of buildings. The interests of Standard Oil Company and Shell Oil and Gas Company, if any, do not appear in the portion of the transcript included in the appeal record.

Prior to the condemnation, the Wilson tract contained 44 acres located on the west side of U. S. Highway 15, approximately 2.5 miles south of the center of the City of Bishopville. It was approximately rectangular in shape and fronted on U. S. Highway 15 for approximately 670 feet. Located on the southern portion of the property, near Highway 15, there were improvements consisting of a mercantile store building, two grain bins and a warehouse. A county road, leading to U. S. Highway 15, extended along the southern boundary of the Wilson property. Condemned by the Department was approximately three acres taken for the purpose of approach to an interchange of I-20, a controlled access highway, which will cross U. S. Highway 15 slightly to the south of the Wilson property. U. S. Highway is where it borders the Wilson property is being widened from a two lane highway with no median to a four lane highway

with a traffic median separating the northbound from the southbound lanes. This median will extend, with the exception of one break, the length of the Wilson property and beyond to a point approximately 400 feet north of the northern property boundary. The county road at the southern boundary of the Wilson property is being relocated and, as relocated, will run diagonally across the Wilson property and intersect with U. S. Highway 15 at an angle of approximately sixty degrees. The only break in the above mentioned median is at the intersection of the relocated county road. The angle at which this county road intersects means that southbound traffic turning into the relocated county road will make a sixty degree turn, while northbound traffic entering the county road will make a left turn of approximately one hundred twenty degrees. The severance of the Wilson property by this relocated county road leaves 1.74 acres (an elongated triangle) lying to the south of the relocated county road and 39.26 acres lying to the north thereof. The two grain bins and a substantial portion of the store building hereinabove mentioned were located upon the condemned portion of the land. The warehouse remains upon the above mentioned triangular parcel.

A controlled access line extends from the southern boundary of the Wilson tract to the relocated county road so that there will be no access whatever from the remaining southern portion of the Wilson land to U. S. Highway 15, except via the relocated county road. Included in the condemnation is a triangular site area extending fifty feet north of the relocated county road, with the result that the remaining frontage of the Wilson land bordering the right of way on U. S. 15, to the north of the county road, is reduced to approximately 330 feet.

The condemnees contended and offered evidence to the effect that the highest and best use of three to four acres of the land bordering U. S. 15 was for commercial purposes and the highest and best use of the remainder was for farm land. Witnesses for the department regarded it all as being

farm land. The condemnees claimed damages for loss of access to U. S. 15, due to the limited, controlled access, the construction of the median, taking of improvements within the right of way, and poor accessibility to the warehouse and the land remaining on the south side of the county road. Witnesses for the condemnees testified as to total damages ranging from about $46,000 to nearly $66,000. The witnesses for the Department contended that the benefits exceeded any damage by some five to ten thousand dollars, because, as a result of the construction, the remaining portion of the Wilson land would be the first accessible to northbound traffic leaving I-20, and the last accessible to southbound traffic on U. S. 15 about to enter I-20. In view of the respective contentions, the nature of the access to the remaining portions of the Wilson land after construction, and the effect thereof on the value of the remainder, became most important issues in the case.

The trial court declined a requested charge by the Highway Department to the effect that any diminution in the value of the remaining property, resulting from the constrution of the median, was not a compensable element of damage, since the construction of the median was an exercise of the State's police power, rather than its power of eminent domain. It is now asserted that the failure to so charge constituted prejudicial error.

This court has previously recognized that there is a distinction between the exercise of the police power and the exercise of the power of eminent domain; that just compensation is required in the case of the exercise of eminent domain but not for the loss by the property owner which results from the constitutional exercise of the police power. *Richards v. City of Columbia,* 227 S. C. 538, 88 S. E. (2d) 683; *Edens v. City of Columbia,* 228 S. C. 563, 91 S. E. (2d) 280. While we, apparently, have not heretofore had the precise question before us, the clear weight of authority from other jurisdictions is to the effect that the construction of a median, or other traffic control

devices, is an exercise of the police power; and that where there is no other taking or damaging of the property of an abutting landowner, the landowner is not entitled to compensation for any resulting damage.

Additionally, there is considerable authority from other jurisdictions to the effect that, even though there be other taking or damaging of the property of an abutting landowner, under the power of eminent domain, the landowner is still not entitled to recover any damage resulting from the concomitant construction of a median or other traffic control device. *Barnes v. North Carolina State Highway Commission,* 257 N. C. 507, 126 S. E. (2d) 732 (1962); Annotation 73 A. L. R. (2d) 689.

While no case precisely in point factually with the instant case has been cited or come to the attention of the court, the Department urges us to adopt and apply to the facts of the instant case the rule of law last above mentioned.

The decisions of courts from other jurisdictions are, of course, only persuasive authority and we are not convinced that the rule which the Department would have us adopt is a sound one. To the contrary, our pertinent constitutional provision, our statutory law, and the prior decisions of this court interpreting the same lead us to the conclusion that the trial judge properly refused the Department's request to charge.

The Constitution of this State, Article I, Sec. 17, provides that "* * * private property shall not be taken * * * for public use without just compensation being first made therefor." We have consistently held that the deprivation of the ordinary beneficial use and enjoyment of one's property is equivalent to the taking of it, and is as much a taking as though the property were actually appropriated to the public use. We have consistently held that within the purview of this constitutional provision, there is no distinction between taking and damaging and that the least damage to property constitutes a taking within the

purview of the Constitution. *Owens v. South Carolina State Highway Dept.,* 239 S. C. 44, 121 S. E. (2d) 240 (1961); *Webb v. Greenwood County,* 229 S. C. 267, 92 S. E. (2d) 688 (1956); *Early v. South Carolina Public Service Authority,* 228 S. C. 392, 90 S. E. (2d) 472 (1955); *Milhous v. State Highway Dept.,* 194 S. C. 33, 8 S. E. (2d) 852 (1940); *Chick Springs Water Co. v. State Highway Dept.,* 159 S. C. 481, 157 S. E. 842 (1931).

Section 33-135 of the 1962 Code of Laws provides for just compensation to the landowner, upon the acquisition of a highway right of way, and specifically includes any special damages resulting therefrom.

In the recent case of *South Carolina State Highway Dept. v. Allison,* 246 S. C. 389, 143 S. E. (2d) 800 (1965), we held, *inter alia,* that,

"* * * an abutting property owner has a right of access over a street adjacent to his property, as an appurtenance thereto. And that an obstruction that materially injures or deprives the abutting property owner of ingress or egress to and from his property is a 'taking' of the property for which recovery may be had. The fact that other means of access to the property are available affects merely the amount of damages, and not the right of recovery."

With respect to special damages, which the landowner is entitled to recover, we, in *South Carolina State Highway Department v. Bolt,* 242 S. C. 411, 131 S. E. (2d) 264 (1963), quoted with approval the following from 18 Am. Jur. 905, Sec. 265,

"In other words, he is entitled to full compensation for the taking of his land and all its consequences; * * * nor is there any requirement that the damage be special and peculiar, or such as would be actionable at common law; it is enough that it is a consequence of the taking. The entire parcel is considered as a whole, and the inquiry is, how much has the particular public improvement decreased the fair market value of the property, taking into consideration the

use for which the land was taken and *all the reasonably probable effects of its devotion to that use."* (Emphasis added.)

In the instant case, prior to condemnation, the Wilson tract fronted on U. S. Highway 15 for a distance of 670 feet, and, according to the landowners, the highest and best use of this frontage was for commercial purposes. As a result of the condemnation and construction, the frontage on U. S. Highway 15 has been reduced to 330 feet with access to only the southbound lanes of U. S. Highway 15.

The Wilson tract has been severed into two parts and with respect to the southern portion, there is no access to either the north or southbound lanes of U. S. Highway 15 except via the county road. None of the remaining land will have any access to and from the northbound lanes of U. S. Highway 15 except via the county road. In speaking of this limited access to the northbound lanes of U. S. Highway 15, Mrs. Drayton, one of the owners, in her testimony attributed a specific sum to damages which, in her opinion, were caused by the construction of the median, and Mr. Drayton based his estimate of the damages, at least in part, on the existence of the median. The only expert who testified for the landowners, however, testified to the effect that it was virtually impossible to separate from the overall picture what portion, if any, of the damages sustained by the landowners was actually attributable to the median. While factual issues were for the jury and not for this court, when the plans and specifications of the Department are studied, we are inclined to agree with the expert who testified for the landowners.

While the construction of a median, with nothing more, may very well be an exercise of the police power with no resulting compensable damage to an abutting property owner, in the instant case the proposed median is only an incidental part of the overall Department plans and contemplated construction. There is no suggestion of the need for, or the contemplated construction of, a

median except as an incidental part of the major relocation and construction plans of the Department. But for such over-all construction and relocation, and condemnation under the power of eminent domain for such purposes, there would have been no median and, of course, no damage to the abutting landowner. It logically follows, we think, that any damage attributable to the planned median is an incidental result of the exercise of the power of eminent domain, and under these circumstances we know of no sound reason for departing from the established rule in this State, which is as follows:

" 'The entire parcel is considered as a whole, and the inquiry is, how much has the particular public improvement decreased the fair market value of the property, taking into consideration the use for which the land was taken and all the reasonably probable effects of its devotion to that use.' " *South Carolina State Highway Dept. v. Bolt, supra.*

Witnesses for the landowners were allowed to testify, over objection, in regard to the sales prices of two properties sold in 1959, approximately nine years before the condemnation in the instant case. The Department asserts that such sales were too remote in point of time and, accordingly, that there was an abuse of discretion on the part of the trial judge in admitting such evidence. The record shows that none of the witnesses had been able to discover any fairly recent sales of comparable property in that area. It is elementary that the admission or exclusion of evidence is a matter which is addressed to the sound discretion of the trial judge and that in the absence of a clear abuse of such discretion, amounting to an error of law, his ruling will not be disturbed. While the sales referred to were quite remote in point of time, we are not convinced, under the circumstances here, that there was any abuse of discretion or prejudice to the Department. The per acre prices involved in these two sales were approximately one half of the per acre price claimed by the landowners as the market value of their comparable acreage, and for this reason, evidence as to these two

particular sales tended to be beneficial rather than prejudicial to the Department.

In the course of the cross examination of Mr. Drayton, he was asked to state a definition of "fair market value" and he gave the following response:

"Fair market value is what you would take personally if you were selling."

He further stated that the same would apply whether he was buying or selling and that he had valued the land accordingly. Based on such, counsel for the Department asked that the jury be excused and moved that *all of the testimony of Mr. Drayton* be stricken because he was not testifying on the basis of "fair market value" as legally defined. Such motion was overruled and properly so. The motion was entirely too broad since Mr. Drayton had testified as to various matters other than the fair market value of the land. Moreover, his testimony, when considered in full, discloses that he had a clear concept of "fair market value" as defined by the courts, even though he, a layman, was not able to precisely state a legal definition thereof.

In the course of the cross examination of Mrs. Drayton it developed that her knowledge of allegedly comparable sales was gained, at least in part, from an abstract of certain deeds prepared by her attorney, as opposed to seeing the record of such deeds in the court house. Upon such disclosure, counsel for the Department moved to strike all of the testimony of Mrs. Drayton, not just her testimony with respect to comparable sales. As in the case of Mr. Drayton, the motion was entirely too broad and was properly refused on that ground alone.

Mrs. Drayton was one of the owners of the land and the practice in this State is in accord with the general rule that a landowner, who is familiar with his property and its value, is allowed to give his or her estimate as to the value of the land or damages thereto, even though the owner be not an expert. This general rule of law, the rea-

sons therefor, and its application are dealt with in 32 C. J. S., Evidene, § 546 (116), p. 433. Where comparable sales are in part a basis of the opinion as to value, even expert witnesses, as often as not, do not have firsthand information, or personal knowledge, thereabout. The extent and source of a witness' knowledge or information as to allegedly comparable sales, used as a partial basis of opinion, would, as a general rule we think affect merely the weight of the opinion evidence being offered rather than its competency or admissibility.

"Where the witness bases his opinion entirely or chiefly on incompetent or inadmissible matters, it has been held that his testimony must be rejected; but the fact that the witness' knowledge as to market value is largely hearsay will not exclude his opinion, provided the witness gives to such information the sanction of his own general experience and knowledge." 32 C. J. S., Evidence, § 546 (117), p. 449.

The testimony of Mrs. Drayton reflected her knowledge of and familiarity with the real property, and its value, taken and damaged in the instant case. The fact that her knowledge of allegedly comparable sales was gained in part from reading abstracts of recorded deeds prepared by her attorney, rather than the public record thereof, at most affected merely the weight of her tesimony and not the competency or admissibility thereof.

Several exceptions on the part of the appellant have been abandoned, not having been argued in its brief. We are unconvinced that there was any prejudical error in the trial below and the judgment of the lower court is accordingly,

Affirmed.

Moss, C. J., and LEWIS, BRAILSFORD and LITTLEJOHN, JJ., concur.